# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

FELDMAN FAMILY TRUST, ROBERT FELDMAN AS TRUSTEE,

    Plaintiff,

v.

MUTUAL OF ENUMCLAW INSURANCE COMPANY,

    Defendant.

MUTUAL OF ENUMCLAW INSURANCE COMPANY,

    Counterclaimant,

v.

FELDMAN FAMILY TRUST, ROBERT FELDMAN AS TRUSTEE,

    Counterdefendant.

Case No. 2:13-cv-01087-LDG (PAL)

**ORDER**

    Pursuant to a Stock Purchase Agreement, plaintiff-counterdefendant Feldman Family Trust (along with another entity) sold all outstanding shares of common stock in Chicago-Vegas Holding Company, Inc., to defendant-counterclaimaint Mutual of Enumclaw

Insurance Company. Under Article 8 of the Agreement, the parties agreed to indemnify each other. In connection with the transaction, Mutual of Enumclaw deposited funds into an escrow account. While a portion of those funds has been released, Mutual of Enumclaw has not released $464,313.39, but has instead asserted claims for indemnity against the Trust. The Trust has disputed the indemnity claims, and has not released the funds to Mutual of Enumclaw. The Trust initiated this litigation, and Mutual of Enumclaw counterclaimed, each seeking a determination that it is entitled to a determination that it is entitled to the funds, and that the other party must release the funds.

Presently before the Court are the parties' cross-motions for summary judgment (## 18, 19). Having read and considered the moving papers, the briefs, and the record, the Court will grant each party's motion for summary judgment in part, and will deny each motion in part.

Motion for Summary Judgment

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

2

*United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*, at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.,* at 325. Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact. Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The allegations or denials of a pleading, however, will not defeat a well-founded motion. Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). That is, the opposing party cannot

"'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

As stated by the Trust in its claim for declaratory relief, the present matter is before the Court for "a judicial determination and interpretation of the [Agreement] to determine which party is entitled to the Final Escrow Amount." The following sections of the Agreement are relevant to this dispute. Pursuant to §8.02 of the SPA, titled "Indemnification By Sellers:"

> each Seller (and Robert Feldman, jointly and severally with the Feldman Trust, in the case of the representations and warranties of the Feldman Trust) shall indemnify and defend each of Buyer and its Affiliates (including the Company) and their respective Representatives (collectively, the "Buyer Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to or by reason of:
>
> (a)   any inaccuracy in or breach of any of the representations or warranties of such Seller contained in this Agreement or in any certificate or instrument delivered by or on behalf of such Seller pursuant to this Agreement . . . as of the date such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date).

Section 8.04(a) of the Agreement provides that:

> Sellers shall not be liable to the Buyer Indemnitees for indemnification under Section 8.02(a) (other than with respect to a claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty in . . . Section 3.19 . . . (the "**Buyer Basket Exclusions**")), until the aggregate amount of all Losses in respect of indemnification under Section 8.02(a) (other than those based upon, arising out of, with respect to or by reason of the Buyer Basket Exclusions) exceeds $150,000, in which event Sellers shall be required to pay or be liable for all such Losses in excess of $150,000.

Section 3.06 of the Agreement provides that:

> Complete copies of the Company's audited financial statements consisting of the consolidated balance sheet of the Company as of December

4

> 31 in each of the years 2007, 2008 and 2009 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "Audited Financial Statements"), and unaudited financial statements consisting of the consolidated balance sheet of the Company as of July 31, 2010 and the related statements of income and retained earnings, stockholders' equity and cash flow for the seven-month period then ended (the "Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements") have been delivered to Buyer.  With the exception of the Interim Financial Statements for Nevada General Insurance Company which are converted to GAAP (from statutory accounting) only at year end, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements). The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated.

Section 3.19(m) of the Agreement provides that:

> All obligations to any Person under CVHC's Phantom Stock Plan effective as of July 1, 2009, have been or will be borne and satisfied by the Sellers prior to or at Closing. Neither the Company nor the Buyer will have any obligation under such Plan as of the Closing Date.  No amounts due under the Phantom Stock Plan, including the Phantom Stock Payment Amount, will be included in either the Estimated Book Value or the Closing Book Value.

The Trust asserts that "[u]nder the [Agreement], Section 3.06, Mutual [of Enumclaw] must show . . . that the Interim Financial Statements were not in accordance with GAAP." The Trust fails, however, to provide any explanation or argument suggesting that the only representation or warranty that it made in §3.06 was that the Interim Financial Statements would be prepared in accordance with GAAP.  The Trust's characterizations of Mutual of Enumclaw's indemnity claims are not relevant to determining whether Mutual of Enumclaw is limited to maintaining an indemnity claim under §3.06 only on the basis that the Interim Financial Statements were not prepared in accordance with GAAP.  By contrast, a review of §3.06 establishes that the Trust also represented: "The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations

5

of the Company for the periods indicated." Absent from the Trust's papers is any sound argument or basis to conclude that the only manner to establish that a financial statement does <u>not</u> "fairly present the financial condition of the Company" is to establish that the financial statements were not prepared in accordance with GAAP.

Pursuant to §8.02(a), the Trust agreed to indemnify Mutual of Enumclaw, and to pay and reimburse Mutual of Enumclaw for all losses incurred or imposed based upon "any inaccuracy in or breach of any of the representations or warranties of [the Trust] contained in this Agreement." Pursuant to §3.06, the Trust made at least two representations: that the Financial Statements were prepared in accordance with GAAP applied on a consistent basis throughout the period involved, <u>and</u> that the Financial Statements "are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated."

Mutual of Enumclaw has met its burden of establishing that it suffered or incurred a loss. As part of the transaction, Mutual of Enumclaw prepared Closing Financial Statements for each company it was purchasing. The Closing Financial Statement for NGIC indicated that, for the year 2010, the company had a net tax receivable of about $745,000. During the twenty-four month escrow period following the close of the transaction, Mutual of Enumclaw employed Ernst & Young to audit its financials, including those of the companies purchased from the Trust. As a result of its audit, Ernst & Young recorded audit misstatements for NGIC for "other-than-temporary impairment of 3 bonds" in the amount of $159,000, an additional expense for self-insurance liability in the amount of $240,000, and an allocated phantom stock compensation expense in the amount of $260,000. Mutual of Enumclaw reviewed and accepted Ernst & Young's recommendation to record the audit adjustments, recording the errors as losses. As a result of these audit adjustments, the net tax receivable for the company for the year 2010 was reduced from

6

about $745,000 to about $290,754.  Accordingly, Mutual of Enumclaw has shown that it incurred a loss of about $454,246.

Mutual of Enumclaw has also shown that the loss it incurred was caused by its reliance on the Interim Financial Statement provided by the Trust, which did not book the above items.  As provided in the Agreement, the Trust provided Mutual of Enumclaw with Interim Financial Statements.  As noted above, pursuant to §3.06, the Trust warranted that the Interim Financial Statements were prepared in accordance with GAAP *and* that the financial statements fairly presented the financial condition of the companies.

As characterized in an e-mail from Ernst & Young to Mutual of Enumclaw, the differences were "black and white (i.e., not judgmental)."  Further, given the significant tax impact resulting from the booking of these three items, Mutual of Enumclaw has met its burden of showing that the under-booking of the three items caused the Interim Financial Statements to <u>not</u> "fairly present the financial condition" of the companies it was purchasing.

Assuming that the initial burden rests on Mutual of Enumclaw to establish that it suffered a loss because the Interim Financial Statements did not fairly present the financial condition of the companies, the Court finds that Mutual of Enumclaw has met its burden.  Thus, to avoid summary judgment against it and in favor of Mutual of Enumclaw, the burden shifts to the Trust to present admissible evidence raising a triable issue of fact.  It has not done so.  Rather, the Trust argues that it should be absolved of its obligations under §8.02 of the Agreement because Mutual of Enumclaw could have audited the Interim Financial Statements in the 60 days that Mutual of Enumclaw had to prepare the Closing Financial Statements.  The Trust argues that §2.05 of the Agreement, which required Mutual of Enumclaw to prepare the Closing Financial Statements "consistent with sellers' preparation of closing statements prior to the Closing Date" merely required Mutual of Enumclaw to use the same methodology, rather than the Trust's determinations.  The

7

Court disagrees. Nothing in the agreement limited the Trust's indemnification of its §3.06 representations to the 60-day period in which Mutual of Enumclaw was relying on the Interim Financial Statements to prepare the Closing Financial Statements. Rather, the Trust represented that the Interim Financial Statements would "fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated."

The Trust argues that, regardless of whether it must indemnify Mutual of Enumclaw's losses as a result of the failure to book the three items in the Interim Financial Statements, it is entitled to disbursement of the Basket Amount of $150,000 pursuant to §8.04. The Court agrees that Mutual of Enumclaw can only recover its losses attributable to a misrepresentation that exceed $150,000. Accordingly, as Mutual of Enumclaw has established it suffered a loss of $454,246, it is entitled to summary judgment in its favor in the amount of $304,246.

As to the remaining $160,071.39 in escrow, the Trust concedes that Mutual of Enumclaw is entitled to its attorney's fees under the Agreement. While Mutual of Enumclaw has asserted that its attorney's fees may exceed this amount, it has not yet established the amount of its attorney's fees, and is not yet entitled to a determination as to what portion of the remaining funds must be disbursed to it to cover those attorney's fees. The Trust argues that it is speculative whether Mutual of Enumclaw's attorney's fees could exceed $150,000. The Court agrees. However, a material issue exists as to the amount of attorney's fees that Mutual of Enumclaw has incurred. Thus, prior to a determination of the amount of Mutual of Enumclaw's attorney's fees, the Trust is not entitled to a determination that any specific portion of the remaining funds must be disbursed to it, but is entitled only to a determination that it is entitled to that amount remaining after attorney's fees and costs have been disbursed from the Final Escrow Account.

Therefore, for good cause shown,

8

THE COURT **ORDERS** that the Motion for Summary Judgment (#18) filed by Feldman Family Trust, Robert Feldman as Trustee (#18) is GRANTED in part and DENIED in part.

THE COURT FURTHER **ORDERS** that the Motion for Summary Judgment (#19) filed by Mutual of Enumclaw Insurance Company (#19) is GRANTED in part and DENIED in part.

THE COURT FURTHER **ORDERS** that Mutual of Enumclaw is entitled to receive $304,246 of the Final Escrow Amount under the terms of the Stock Purchase Agreement, and is entitled to an order instructing Robert Feldman, as Trustee of the Feldman Family Trust, to authorize U.S. Bank to release the amount of $304,246 into Mutual of Enumclaw's possession.

THE COURT FURTHER **ORDERS** that Mutual of Enumclaw is entitled to attorney's fees and costs, which amount has not yet been determined, but which amount Mutual of Enumclam is entitled to receive from the Final Escrow Account.

THE COURT FURTHER **ORDERS** that the Feldman Family Trust, Robert Feldman and Trustee, is entitled to whatever amount remains in the Final Escrow Account that is in excess of Mutual of Enumclaw's attorney's fees and costs.

DATED this 30 day of March, 2015.

Lloyd D. George
United States District Judge

9